JOHN W. HUBER, United States Attorney (#7226)
LAKE DISHMAN, Assistant United States Attorney (#16274)
KEVIN SUNDWALL, Assistant United States Attorney (#6341)
JAMIE Z. THOMAS, Assistant United States Attorney (#9420)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: lake.dishman@usdoj.gov

**FILED**
U.S. DISTRICT COURT
2019 OCT 24 A 11: 43
DISTRICT OF UTAH

**SEALED**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. HUBERT IVAN UGARTE and RYAN LEE MOWER, Defendants. | INDICTMENT<br><br>VIOLATIONS:<br><br>COUNTS 1-4: 18 U.S.C. § 1343 (Wire Fraud)<br><br>COUNTS 5-10: 18 U.S.C. § 1957 (Money Laundering) |

Case: 2:19-cr-00393
Assigned To : Sam, David
Assign. Date : 10/24/2019
Description:

The Grand Jury charges:

**BACKGROUND**

At all times relevant to this Indictment:

1.    FedEx Ground Package System, Inc., more commonly known as FedEx Ground ("FXG"), was a package transportation and delivery company headquartered in Pennsylvania. FXG operated throughout the United States, including Utah. It was a subsidiary of FedEx Corp., headquartered in Tennessee.

1

2. To move packages across the country, FXG operated approximately thirty-nine hubs, or distribution centers, across the United States.

3. One of FXG's hubs was located in North Salt Lake, Davis County, Utah.

4. As part of its business model, FXG contracted with local trucking companies, known as contract service providers ("CSPs"), to transport packages on behalf of FXG.

5. Defendant HUBERT IVAN UGARTE (UGARTE) is a resident of Salt Lake County, Utah.

6. UGARTE owned, operated, and controlled the following trucking-related companies: All My Daughters Trucking Inc., Arostegui Trucking, Inc., Chasqui Transportation Inc., Diamond Trucking Inc., Frisbu Trucking, Inc., I. & G. Ugarte Trucking, Inc., I&W Diesel, Inc., My Daughters Trucking, Inc., Northern Star Trucking Inc., Princess Transport, Inc., Princess Trucking Inc., Qori Transport Inc., Safe Trucking, Inc., Stars and Stripes Trucking, Inc., Sunrise Transport Inc., Transamerican Trucking, Inc. and Ugarte Enterprises Inc.

7. Each of UGARTE's companies are either FXG CSPs or supported and serviced UGARTE's other companies engaged as CSPs.

8. MOWER was the Senior Linehaul Manager at the North Salt Lake FXG hub. He was FXG's highest-ranking employee in Utah from at least 2008 to October 2019. His primary responsibilities included overseeing the FXG CSPs and ensuring each complied with FXG policies and regulations.

## SCHEME AND ARTIFICE TO DEFRAUD

9. The main object of the scheme and artifice to defraud FXG by UGARTE and MOWER was to exploit MOWER's position within FedEx Ground in order to unfairly grow, give undue preferential treatment to, and protect UGARTE's trucking operations so as to make UGARTE's businesses as lucrative as possible thereby enriching UGARTE and MOWER.

10. Sometime before January 1, 2012, UGARTE began paying MOWER bribes. In exchange, UGARTE asked for and received favors, preferential treatment, and assistance in defrauding FXG.

11. FXG has a strict no bribery policy in order to promote a culture of honesty and integrity. As part of the CSP agreement, FXG reserves the right to terminate a CSP's contract if the CSP engages in bribery or corruption.

12. When UGARTE signed the contract with FXG, he agreed to conduct all business activities with honesty and integrity, and to comply with all federal, state, and local laws. He also agreed that FXG could terminate the contract if either he or the CSP violated any of these provisions of the contract.

13. MOWER understood that accepting bribes would result in FXG terminating his employment.

14. Since at least January 1, 2012, UGARTE and MOWER hid their corrupt relationship from FXG.

15. In return for money, UGARTE exploited MOWER's position at FXG to fraudulently grow and maintain his businesses in several ways.

3

## Fraudulently Obtaining New Assigned Runs

16.     First, UGARTE used MOWER's position to game FXG's process governing the awarding of new runs to FXG CSPs.

17.     A run is an overland trucking route between two or more places, between which FXG needs packages transported by a CSP. Some runs exist only for a day. Others are permanent due to the steady flow of packages between locations. A permanent run is called an assigned run. As demand grows, FXG creates additional assigned runs. Once created, FXG notifies CSPs that the assigned run is available for any CSP interested to apply so the newly created run maybe assigned to a CSP.

18.     The primary way a CSP grows its business with FXG is by obtaining more runs. In every CSP contract, FXG and the CSP agree upon established rules and procedures by which a new run will be awarded. This allows every CSP to expect the same process every time FXG makes a new assigned run available.

19.     Typically, the truck of a CSP that has the most points receives the assigned run. Trucks earn a point each day. Trucks can also earn points for positive safety inspections and during peak season. As such, the awarding of an assigned run should be based on merit.

20.     MOWER's responsibility as Senior Linehaul Manager was to announce and award new assigned runs according to the process agreed upon by FXG and the CSPs as well as ensure the fairness and integrity of the process.

21.     Instead, MOWER ensured UGARTE's companies received the runs in at least two different ways. First, MOWER disproportionately awarded UGARTE's

4

companies with new truck numbers, ultimately allowing those companies to qualify more quickly for earning new assigned runs. Second, MOWER failed to announce newly available assigned runs, instead giving UGARTE assigned runs without initiating through the awarding procedure.

22. Without MOWER's assistance, UGARTE would not have been able to obtain as many routes as he did.

### Hiding the True Growth of the Businesses

23. Second, MOWER helped UGARTE grow his businesses larger than FXG allowed by causing false information to be submitted to FXG.

24. Generally, FXG limits the number of semi-trucks ("tractors") a CSP owner may have service runs originating from the same hub to fifteen. A CSP may seek an exception to have more.

25. FXG does this for many reasons. It protects FXG from becoming too dependent on one CSP in a given area. It allows FXG to spread opportunities available among more local trucking companies. It grants FXG access to more trucking resources that can support its transportation network.

26. FXG depends on its senior linehaul managers to prevent CSPs from growing too large at a single hub. When a CSP gets too big at a particular hub, FXG refers to this as overscale.

27. Rather than follow company protocol, MOWER and UGARTE regularly and systematically concealed UGARTE's true ownership and control of several CSPs from FXG by using another person to act as the owner of the CSP. By doing so,

5

UGARTE obtained and operated more than 40 tractors servicing the North Salt Lake FXG hub.

### **Protecting the Business**

28.  Third, UGARTE was able to use MOWER's position to protect his businesses.

29.  When a CSP obtains an assigned run, it promises FXG it will complete a certain percentage of the required trips. When a CSP cannot service the assigned run on a given day, it is called a declination. As the number of declinations increases, the CSP's rate of completion falls for that specific assigned run. If a CSP's rate of completion drops below the promised completion rate, FXG will take away the assigned run and announce its re-availability to the other CSPs.

30.  MOWER, as Senior Linehaul Manager, oversaw the recording and reporting of declinations for all North Salt Lake hub CSPs.

31.  During several lengthy periods, UGARTE did not have enough truck drivers employed to service all of his CSPs' assigned runs. Instead of documenting each of these declinations and risk UGARTE losing assigned runs, MOWER underreported the true number of UGARTE's declinations. This prevented FXG from finding a more reliable CSP for the assigned run and guaranteed that UGARTE would maintain the rights to some of his assigned runs, and allowed him to continue earning money from those runs.

32.  Despite the fact that UGARTE's companies could not adequately service all of their existing assigned runs, UGARTE continued to press MOWER about obtaining more assigned runs.

### Boosting Miles

33. Using MOWER's position, UGARTE and MOWER falsified mileage reports so that FXG paid UGARTE's companies more than they were entitled.

34. A CSP earns money by completing runs for FXG. The total weekly mileage of the runs completed by a CSP is multiplied by a dollar amount per mile. Thus, the more miles driven, the more money earned.

35. MOWER would regularly inflate, or boost, the number of weekly miles driven by one or more of UGARTE's companies and submit the boosted numbers to FXG, causing FXG to overpay UGARTE.

### Results of the Fraud

36. By fraudulently obtaining assigned runs, actively obscuring business ownership and growth, covering up failed contractual performances, and falsely reporting miles to gain unearned income, UGARTE's companies received approximately $90 million in FXG revenue over the past eight years. During that same period, UGARTE paid MOWER at least $490,000.

### COUNTS 1-4
18 U.S.C. §§ 1343 and 2
(Wire Fraud)

37. The allegations in the preceding paragraphs are incorporated by this reference as though fully set forth herein.

38. On or about the dates listed below, in the District of Utah and elsewhere,

HUBERT IVAN UGARTE and RYAN MOWER,

7

defendants herein, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing said scheme and artifice to defraud, did cause to be transmitted in interstate commerce by means of wire communication certain writings, signs and signals, each such use of wire communication being a separate count of this Indictment; all in violation of 18 U.S.C. §§ 1343 and 2.

| Count | Date | Interstate Wire Transaction |
|---|---|---|
| 1 | 2/20/2018 | UGARTE and MOWER caused false shareholder information, namely recording J.U. as the 100% owner of Ugarte Enterprises Inc., to be entered into FXG's CSP portal website named *MyGroundBizAccount*, which information was transmitted to and stored in a FXG server located outside the state of Utah. |
| 2 | 6/27/2018 | UGARTE and MOWER caused false shareholder information, namely recording M.T. as the 100% owner of Stars and Stripes Trucking Inc., to be entered into FXG's CSP portal website named *MyGroundBizAccount*, which information was transmitted to and stored in a FXG server located outside the state of Utah. |
| 3 | 4/17/2019 | During Ugarte Enterprises Inc.'s annual compliance certification as a FXG CSP, UGARTE and MOWER caused J.U. or someone purporting to be J.U. to electronically sign and affirm that the ownership information recorded in Count 1 was still correct, which information was transmitted to and stored in a FXG server located outside the state of Utah. |
| 4 | 4/17/2019 | During Stars and Stripes Trucking Inc.'s annual compliance certification as a FXG CSP, UGARTE and MOWER caused M.T. or someone purporting to be M.T. to electronically sign and affirm that the ownership information recorded in Count 2 was still correct, which information was transmitted to and stored in a FXG server located outside the state of Utah. |

## COUNTS 5-10
18 U.S.C. §§ 1957 and 2
(Money Laundering)

39. The allegations in paragraphs 1 through 38 are incorporated by this reference as though fully set forth herein.

40. On or about the dates set forth below, in the District of Utah and elsewhere,

HUBERT IVAN UGARTE,

defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the withdrawal, transfer, exchange of U.S. currency, and deposit of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of Wire Fraud in violation of 18 U.S.C. § 1343; all in violation of Title 18 U.S.C. §§ 1957 and 2:

| Count | Date | Monetary Transaction |
|---|---|---|
| 5 | 11/17/2014 | Mountain America Credit Union deposited a check worth $22,196.35 issued by UGARTE from US Bank account ending in 5690, a business account of Frisbu Trucking Inc., for the purchase of a 2014 GMC Acadia. |
| 6 | 11/25/2015 | A.C. deposited a check worth $200,000.00 issued by UGARTE from US Bank account ending in 7149, a business account of Transamerican Trucking, Inc., as payment for renovations performed on a residence located at 338 E Dairy Ln., Draper, Utah 84020. |
| 7 | 3/2/2017 | L.S.F. deposited a check worth $41,510.00 issued by UGARTE from US Bank account ending in 3950, a business account of I & G Ugarte Trucking, Inc., as a purchase payment for a 2017 Ford F-350. |
| 8 | 3/10/2017 | J.S.C. deposited a check worth $50,662.14 issued by UGARTE from US Bank account ending in 1120, a business account of Arostegui Trucking, Inc., as a purchase payment for a 2017 Cadillac Escalade. |
| 9 | 10/4/2017 | UGARTE wired $37,832.46 from his personal US Bank account ending in 3777, to an account at KeyBank for F.M., as a mortgage payment for a residence located at 322 E Mountain Berry Dr., Draper, Utah 84020. |
| 10 | 11/29/2018 | S.L.V.A. deposited a check worth $23,500.00 issued by UGARTE from US Bank account ending in 3950, a business account of I & G Ugarte Trucking, Inc., as a purchase payment for a 2018 Jeep Renegade. |

## **NOTICE OF INTENT TO SEEK FORFEITURE**

41. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense in violation of 18 U.S.C. § 1343, as set forth in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud. The property to be forfeited includes, but is not limited to, the following:

    a. Real property located at:

        i. 338 E Dairy Lane, Draper, Utah;

        ii. 1237 W 2285 S, Woods Cross, Utah;

        iii. 322 E Mountain Berry Dr., Draper, Utah;

        iv. 201 E. 13560 S, Draper, Utah;

        v. 301 E State Route 115, Herscher, Illinois, 60941 (a 4.92% interest in this property including rents attributable to such interest); and

        vi. 1401 Windy Lane, Jerseyville, IL, 62052 (an 18.93% interest in this property including rents attributable to such interest).

    b. A money judgment equal to the value of any property, real or personal, constituting or derived from proceeds traceable to the scheme to defraud and not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p); and

    c. Substitute property as allowed by 21 U.S.C. § 853(p) via 28 U.S.C. § 2461(c).

42. Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 and/or 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to the following:

    a. A money judgment equal to the value of all property involved in the money laundering and any property traceable to such property and not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p); and

    b. Substitute property as allowed by 21 U.S.C. § 853(p) via 18 U.S.C. § 982(b).

## GRAND JURY'S PROBABLE CAUSE FINDING REGARDING FORFEITURE

43. The grand jury finds probable cause to believe that

    a. Hubert Ivan Ugarte has committed the crimes specified in the above forfeiture notice;

    b. that the following assests are constituted or derived from proceeds traceable to the wire fraud scheme; and

    c. that such assets would be subject to forfeiture in the event of UGARTE's conviction:

   i.  A 4.92% interest in real property located at 301 E State Route 115, Herscher, Illinois, 60941 (including rents attributable to such interest) and

   ii.  An 18.93% interest in real property located at 1401 Windy Lane, Jerseyville, IL, 62052 (including rents attributable to such interest).

     A TRUE BILL:

     _____
     FOREPERSON OF THE GRAND JURY

JOHN W. HUBER
United States Attorney

_____
LAKE DISHMAN
Assistant United States Attorney